No. 37,420

W. C. West, *Appellant*, v. Jim Lear, *Appellee*.

(205 P. 2d 910)

Opinion filed May 7, 1949.

*B. V. Hampton,* of Pratt, argued the cause, and *R. F. Crick,* of Pratt, *Tudor W. Hampton, S. R. Blackburn, Barton Carothers* and *Ed R. Moses,* all of Great Bend, were with him on the briefs for the appellant.

*J. B. Patterson,* of Wichita, argued the cause, and *A. W. Hershberger, Richard Jones, Wm. P. Thompson,* all of Wichita, *Alfred Williams* and *Max C. Bucklin,* both of Pratt, were with him on the briefs for the appellee.

The opinion of the court was delivered by

ARN, J.: This is a damage action for personal injuries sustained by plaintiff when he was struck by a guy wire while he was riding on top of a schoolhouse being moved through the city of Pratt, Kan., on July 1, 1946. Plaintiff was employed by the municipal power and light department of the city of Pratt as a lineman. Defendant is a house mover having been engaged in such business in and around Pratt for several years.

The jury verdict was for defendant without special findings. When plaintiff's motion for a new trial was overruled, he appealed,

claiming error as follows: That the verdict was contrary to and not supported by the evidence; that the trial court did not approve the verdict, and that a new trial should have been granted plaintiff.

The facts may be summarized thus: Defendant was engaged in moving a schoolhouse to a location in the city of Pratt for the Pentecostal Church. The building, mounted on beams and wheels, was drawn along the highways and streets by a truck driven by the defendant himself, who was seated in the cab of the truck. Moving this object through the city required the services of three crews of men; (a) the defendant house mover's crew; (b) the city power and light department's crew; and (c) the telephone company crew. These three crews were working together on this occasion and had done so upon many previous occasions. Section 17-1917, G. S. 1935, requires the owners of the overhead wires to safely clear them for such buildings in the process of being moved, and authorizes the making of appropriate charges therefor to be paid by those interested in the house-moving project. Apparently each crew was composed of at least three men. Plaintiff was one of the three members of the city crew. The crews used an established code of signals. A signalman preceded the truck on foot, and upon approaching a wire he would relay the signals of the men on the roof of the building to the defendant truck driver. According to custom the signalman remained at his station until the wire or other obstruction was cleared. Men on the roof could not see the truck driver nor could he see them. Any of the men were capable of acting as signalmen. On the occasion of plaintiff's injury, the signalman was also a member of the city power and light department crew, and he had been acting as signalman from a point sixteen miles north of Pratt to the scene of the accident in Pratt. He preceded the building riding in a city truck and when wires were encountered he dismounted and walked ahead to give signals. During this sixteen miles several wires, both electric and telephone, had been passed. Just prior to the accident the truck and conveyance stopped for the Rock Island tracks in the city of Pratt. One of defendant's employees was sent to the nearby railroad depot to obtain clearance for the railroad crossing while defendant remained in the truck cab. Just before the railroad stop a telephone wire had been encountered and that wire was across the top of the building during the stop for the railroad crossing. But while defendant waited for his employee to return from the railroad depot with the crossing clearance, the signalman mounted the back of the

city truck and proceeded south to the set of wires next to be encountered. Defendant's employee returned from the depot and reported that no trains were coming. Thereupon defendant, apparently unaware that a telephone wire had been left resting on top of the building and that the signalman had left the scene, proceeded to drive across the railroad tracks. At that time four men were on the building roof—one of them the plaintiff, one an employee of defendant, and two employees of the telephone company. Before the schoolhouse was moved a bell tower or cupola on its roof had been removed and the frame base of this cupola remained astride the ridge of the roof and projecting out on each side so that the outer edges of this base had an elevation above the roof on each side of about fourteen inches. When the signalman gave the last stop signal and the last stop was made before the railroad crossing, this cable was stretched across the roof approximately six or eight feet south of or in front of the cupola base. The four men on the roof were seated upon and about the cupola base. Without any signal and perhaps suddenly (some dispute as to the suddenness) the truck and building were put in forward motion by defendant truck driver and the cable across the roof moved toward the rear of the building catching plaintiff between the cable and the cupola base causing severe injuries. There was some testimony that a telephone company employee upon the roof had time to pick up the wire before the truck started to move, and that he was guiding the three-eighths- to one-half-inch cable along the roof, but he couldn't walk as fast as it was going and it got away from him. Another witness said the telephone company employee had hold of the wire or cable and it got away, and the next thing plaintiff was pinned there between the cable and the cupola base.

From these facts plaintiff contends that as a matter of law it was negligence for defendant to start the building forward without a signal to the men on the roof. But even though there is merit to that argument, it can be of little comfort or assistance to plaintiff if he himself was negligent. So first, let us examine some of the evidence which appellee contends constitutes contributory negligence on the part of the plaintiff.

Plaintiff testified:

"Q. Well, how did you expect Mr. Lear was going to know when and when not to move if the signalman was gone? A. They are not supposed to move except when they get a signal.

"Q. You saw the signalman leave didn't you? A. Yes, sir. . . .

"Q. And you say this wire, this cable, was stretched fairly tight across the comb there? A. It was pretty tight.

"Q. And you knew that if that truck did move for any reason that that cable would come on back? A. Why sure it would come back if the house would go ahead.

"Q. You knew that if the truck did move the cable would come on back, stretched as tight as it was, with considerable force? A. According to how fast the truck moved.

"Q. But it would come back with considerable force, didn't you know that? A. Well, if we hit it, it would have considerable force, yes.

"Q. There was room on there to have sat behind that cupola, wasn't there? A. Yes."

Redirect examination.

"Q. Now, you stated in cross examination that you saw the signalman drive—get in the back of a truck and drive off with the driver? A. Yes, sir.

"Q. Did you make any effort to move at that time? A. No, sir."

And a defendant witness (Ramsey) testified:

"Q. Where were you at the time this accident occurred? A. I was on the roof. . . . Me and Bill West [plaintiff] was setting on the cupola on the front shooting the bull. We was setting there shooting the bull. Bill Coltrane was up to the front end when this happened. That other boy was back of me and Bill West was setting there on the cupola of the house. The house stopped and I don't how long me and him was shooting the bull, we were setting there talking. The first thing I know the house started up, the house started rolling and me and Bill wasn't paying no attention about the cable. We wasn't supposed to be setting there where we was. First thing I know it had us that quick. . . .

Q. Could this wire have hit you if you had been sitting on the back of the cupola? A. No, it wouldn't have hit us if we had been back of the cupola. I wasn't paying no attention about the cable."

The testimony above referred to, appellant contends, is not sufficient to support any allegations of contributory negligence, and therefore the question of contributory negligence could not be resolved in favor of defendant by the jury's general verdict.

Since defendant was the one who put the vehicle in motion without a signal, there was perhaps sufficient evidence by which the jury could have found him negligent. There was also sufficient evidence from which to find negligence on plaintiff's part, and we must assume from the general verdict that the jury did so find. We are not concerned with weighing the negligence or measuring the degree of negligence as between the two parties. We cannot say as a matter of law that the defendant was guilty of gross and wanton negligence. Neither can we say that plaintiff was not negligent

as a matter of law, when there was some evidence to justify the jury's belief that he was. Therefore, if plaintiff was himself negligent, and such negligence contributed to his injury, he cannot recover regardless of defendant's negligence. The jury was so instructed. So, we have here a fact case with conflicting and disputed evidence where reasonable minds might reach different conclusions, both as to contributory negligence of the plaintiff and as to defendant's negligence. There being sufficient evidence to support it, the general verdict of the jury resolved these and all other issues in favor of the defendant. (*Schuette v. Ross*, 164 Kan. 432, 190 P. 2d 198, and many other cases.)

Appellant also contends that the trial court overruled plaintiff's motion for a new trial and rendered judgment for defendant without approving the jury verdict. It is a very natural and common thing during a jury's deliberations for trial judges, like anyone else who may have witnessed the trial, to guess or speculate upon what a jury's verdict will be—and when the verdict is rendered contrary to what the trial judge thought it would be, it does not necessarily require a disapproval by the trial court. Here the trial court may have surmised what the jury verdict might ultimately be, and that he was surprised when a different verdict was returned is indicated by his remarks to counsel at the time of argument on the motion for new trial:

"I will have to confess that I was somewhat surprised at your verdict in this case, but as I see it we submitted the question of contributory negligence to the jury and I think the jury must have found that the plaintiff was guilty of contributory negligence. I don't think there was any question about the defendant's negligence, in fact I think I practically instructed the jury that he was negligent, but however slight the plaintiff's negligence was, if it contributed to his injury and damage, of course he would be barred.

"Well, the jury evidently took somewhat seriously Mr. Ramsey's testimony. I think you could probably find in his testimony some contributory negligence on the part of the plaintiff, and for me now to say there wasn't sufficient evidence of contributory negligence to uphold the verdict, would seem to me like to be taking from the jury their right to determine that question. I don't think this Court ought to say there was no evidence of contributory negligence in this case. I think the Court could say that there is no doubt but what the defendant was negligent, but for the Court to submit to the jury the question of contributory negligence and then now to say that there was no contributory negligence shown seems to me like it would be at least contradictory, and I wouldn't want to say there was no contributory negligence shown in this case, even though my own opinion is it was rather slight. The jury passed on it. I'll let the verdict stand. Motion for New Trial overruled."

But surprised or not, the trial court did thereupon approve the verdict as indicated by the last paragraph of the journal entry of judgment, which provides:

"And now, on this 9th day of April, 1948, the above cause comes on for hearing on plaintiff's motion for new trial. The court, having listened to argument of counsel and being fully advised in the premises, *finds that said verdict should be approved* and that plaintiff's motion for new trial should be overruled." (Emphasis supplied.)

We fail to find any merit in appellant's contention that the foregoing statement by the trial judge, particularly in view of the final order of judgment actually made by him, amounted to a failure on the part of the trial court to approve this jury verdict. On the contrary the trial court did, in so many words, state that the verdict *should be approved.*

In the cases cited by appellant in support of his contention in this respect, such affirmative approval of the verdict was not given by any order of the trial court, and therefore those cases do not support his argument here. For example, in *Butler v. Milner*, 101 Kan. 264, 166 Pac. 478, no positive statement was made by the trial court that the jury's verdict was approved, and there this court said:

"If on the other hand, the trial judge intended to give his approval to the verdict, we are bound by the result regardless of any opinion we might have as to the right or wrong of the judgment, because there is no ground for any suggestion that to deny a new trial would have been an abuse of discretion if the court approved the verdict. Indeed no suggestion of that kind is made.

"For the reasons stated we think the judgment should be reversed and the cause remanded with directions that a new trial be granted, unless the trial court shall make a finding that it approves the verdict. In case the verdict is thus approved, the judgment will be affirmed." (l. c. 268.)

If the trial judge in the Butler case had intended to give his approval to the verdict but inadvertently omitted to say so in the record, he could have corrected that omission and have complied with the mandate of this court by merely putting into the journal entry of judgment, *nunc pro tunc,* his statement that the verdict should be approved. As has been already pointed out, the journal entry of judgment in the instant case, duly signed by the trial judge, already contains his finding that *said verdict should be approved.* No clearer statement can be asked of the trial court.

The motion for a new trial was made upon several grounds other than that the verdict was contrary to the evidence, but from an

examination of the entire record, we find no error which would require a new trial. This was a fact case for determination by a jury. The evidence has been examined, and certainly it may be said that it was sufficient to sustain the verdict of the jury. Having ascertained this fact, this court on appeal has no function to perform with respect to the evidence.

Accordingly, the judgment of the trial court is affirmed.